GRETHER et al. v. WRIGHT et al.

(Circuit Court of Appeals, Sixth Circuit. July 8, 1896.)

No. 399.

1. EQUITY PLEADING AND PRACTICE—DEMURRER.
    A demurrer to an answer is unknown in the equity practice of the federal courts. The only way in which the sufficiency of an answer can be tested is by setting the case down for hearing upon the bill and answer, the effect of which is an admission by complainant of all averments of fact properly pleaded in the answer, and a waiver of any right to contest them by replication and proof. Where, however, a demurrer is in fact filed to the answer, and no objection is made thereto, the court may treat the demurrer as an application to set down the cause upon bill and answer.

2. FEDERAL EQUITY JURISDICTION—RIGHT TO JURY TRIAL—STATE STATUTES GIVING EQUITABLE REMEDIES.
    The main purpose of Rev. St. § 723, which provides that suits in equity shall not be sustained in the federal courts when a plain, adequate, and complete remedy may be had at law, was to emphasize the necessity for preserving to litigants in the federal courts the right to jury trial secured by the seventh amendment to the constitution in suits at common law. Therefore, where a state statute grants an equitable remedy which does not infringe on the right to a jury trial, the federal courts sitting in the state as courts of equity may grant the same statutory relief as is afforded in the state tribunals.

3. SAME—SUITS TO ENJOIN ILLEGAL TAXATION.
    In a controversy over the legality of a tax levied by a state, the state's representatives have no right to insist upon a jury trial, as a right secured to them by the seventh amendment to the federal constitution, unless the state exacts the right in its own behalf. Therefore, where a state expressly gives a remedy by injunction against the assessment and collection of taxes on the ground of illegality (Rev. St. Ohio, §§ 5849-5851), such statutory remedy may be afforded by the federal courts sitting in equity.

4. STATE TAXATION OF FEDERAL BONDS—DISTRICT OF COLUMBIA BONDS.
    The provision in the act of June 20, 1874 (18 Stat. 120, § 7), providing for the issuance of bonds of the District of Columbia, that such bonds "shall be exempt from taxation, by federal, state or municipal authority," applies not only to taxation within the District of Columbia, but to taxation anywhere within the limits of the United States, whether by federal, state, or municipal authority.

5. SAME—CONSTITUTIONAL LAW.
    Where congress lawfully directs the issue of evidences of indebtedness in the exercise of any power derived from the constitution, whether by virtue of the grant of power to borrow money on the credit of the United States or of any other grant, such evidences of debt are exempt from state taxation, or at least may be exempted therefrom, if congress see fit to do so.

6. SAME—EXEMPTION.
    The grant of authority to congress to exercise exclusive legislation over the District of Columbia (Const. art. 1, § 8, cl. 17) was a grant not merely for the benefit of the locality, but for a high national purpose; and therefore congress has constitutional power to declare that bonds issued by the District of Columbia, to be paid in part by a taxation of property within the District and in part by appropriations from the revenues of the United States, shall be exempt from taxation by state or municipal authority, and the act of June 20, 1874 (18 Stat. 120), which contains a clause to that effect, is constitutional and valid.

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

The action below was by bill in equity, filed by John B. Wright and Charles Baird, the surviving executors of the last will and testament of Thomas W. Cornell, deceased, to restrain John Grether, auditor of Summit county, Ohio, and Robert L. Andrew, treasurer of the same county, from proceeding to collect taxes amounting to $36,405, claimed by the county officers to be due from said estate as taxes, which were assessed by the defendant auditor, or his predecessor in office, against Thomas W. Cornell, for the years 1887, 1888, 1889, 1890, 1891, and 1892. The assessment was made under section 2781 of the Revised Statutes of Ohio on the ground that said Cornell, a citizen of Ohio, resident in Summit county, had been, during the years mentioned, the owner of $150,000 par value of the bonds of the District of Columbia, and had made a false return in respect thereto, or had evaded making a return concerning the same. Section 2781 is as follows:

"Sec. 2781. If any person whose duty it is to list property or make (a) return thereof for taxation, either to the assessor or county auditor, shall, in any year or years, make a false return or statement, or shall evade making a return or statement, the county auditor shall, for each year, ascertain, as near as practicable, the true amount of personal property, moneys, credits and investments that such persons ought to have returned or listed for not exceeding (the) five years next prior to the year in which the inquiries and corrections provided for in this and the next section are made; and to the amount so ascertained for each year, he shall add fifty per centum, multiply the sum or sums thus increased by said penalty by the rate of taxation belonging to said year or years, and accordingly enter the same on the tax lists in his office, giving a certificate therefor to the county treasurer, who shall collect the same as other taxes."

The assessment was made upon the duplicate after the death of Thomas W. Cornell, in September, 1892, but it was in form made under section 2781, as against him personally for the years during which he was alive, and it so appears upon the duplicate. The bill averred that the bonds thus assessed for taxation were bonds of the United States, and expressly exempted by act of congress from all taxation, federal, state, or municipal, and that the assessment was therefore illegal. The bill further averred that the assessment had been made by the auditor without granting a hearing, that the treasurer was about to collect the same by distraint, and that the complainants, the executors of Cornell, under his will, were without adequate remedy at law. The bill was demurred to for want of equity. The demurrer was overruled, and the defendants then filed separate answers, in which answers the exemption from taxation of the bonds assessed was denied, the want of notice was denied, and the intention of the treasurer to distrain or to assert his right to collect the taxes assessed in any other way than by ordinary suit at law was denied. The complainants then filed what is called in the record a "demurrer to the answers," seeking thereby to raise the question of the sufficiency of the facts stated in the answers to defeat the relief prayed in the bill. The form of pleading was not objected to. The court passed upon the sufficiency of the answers, and held that they were insufficient, and entered a decree perpetually enjoining the collection of the tax, on the ground of its illegality.

W. W. Boynton and William L. Avery (Grant & Sieber and Boynton & Horr, of counsel), for appellants.

Charles Baird (Wm. H. Upson, of counsel), for appellees.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

A demurrer to an answer is unknown in the equity practice of the federal courts, as it was unknown to the practice of the high

court of chancery in England. Crouch v. Kerr, 38 Fed. 549; Banks v. Manchester, 128 U. S. 244, 9 Sup. Ct. 36; Travers v. Ross, 14 N. J. Eq. 254, 258; Winter v. Claitor, 54 Miss. 341; Edwards v. Drake, 15 Fla. 666; 1 Daniell, Ch. Prac. 542. The only way by which the sufficiency of an answer to the bill in equity can be tested is by setting the case down for hearing upon bill and answer, the effect of which is an admission by the complainant of all the averments of fact properly pleaded in the answer and a waiver of any right to contest them by replication and proof. Barry v. Abbot, 100 Mass. 396; Brown v. Mortgage Co., 110 Ill. 235; Stone v. Moore, 26 Ill. 165. If, therefore, any objection had been taken to the demurrer filed to the answer, it must have been stricken from the files, but as no objection was taken in the court below, and as no objection is made on the hearing in this court to the form of the proceeding, we shall treat the demurrer filed by the complainant as an application to the court to set down the case upon bill and answer, and consider the decree as if it had been entered upon such hearing. Barry v. Abbot, 100 Mass. 396.

The first ground for reversing the decree of the court below pressed upon us is that the bill did not state a case of equitable jurisdiction. In order to make this contention clear, counsel for the appellant has gone into an elaborate argument to show that the only course permitted by law to the county treasurer in the collection of this tax against the executor would be by an ordinary suit for the collection, and that under the law in such a case he would have no power to distrain. Whether he would have such power or not we do not regard as material, because the answer of the treasurer, which must be taken as true, avers that he has no intention of distraining, and will take no other method of collecting the tax than by suit against the executors. Section 2859 of the Revised Statutes of Ohio certainly gives the remedy to the treasurer by civil action, in which the defendant could make defense at law and have a trial by jury. Therefore, unless the complainants below were entitled to file a bill to restrain the tax on the sole ground of its illegality, we think that the decree should have dismissed the bill without prejudice on the ground that there was no equitable jurisdiction.

Chapter 13 of title 1 of division 7 of the Revised Statutes of Ohio is entitled "Taxes and Assessments—Relief against Illegal," and contains four sections, which are as follows:

"Sec. 5848. Courts of common pleas and superior courts shall have jurisdiction to enjoin the illegal levy of taxes and assessments, or the collection of either, and of actions to recover back such taxes or assessments as have been collected, without regard to the amount thereof, but no recovery shall be had unless the action be brought within one year after the taxes or assessments are collected.

"Sec. 5849. Actions to enjoin the illegal levy of taxes and assessments must be brought against the corporation or person for whose use and benefit the levy is made; and if the levy would go upon the county duplicate the county auditor must be joined in the action.

"Sec. 5850. Actions to enjoin the collection of taxes and assessments must be brought against the officer whose duty it is to collect the same; actions to recover back taxes and assessments must be brought against the officer who

made the collection, or if he is dead, against his personal representative; and when they were not collected on the county duplicate, the corporation which made the levy must be joined in the action.

"Sec. 5851. If the plaintiff in an action to enjoin the collection of taxes or assessments admit a part thereof to have been legally levied, he must first pay or tender the sum admitted to be due; if an order of injunction be allowed, an undertaking must be given as in other cases; and the injunction shall be a justification of the officer charged with the collection of such taxes or assessments for not collecting the same."

It was in reliance on these sections that the court below held that the appellees or complainants below were entitled to file a bill in equity to enjoin the taxes solely on the ground of their illegality. The court followed the case of Cummings v. Bank, reported in 101 U. S. 153. That was a suit by a national bank to enjoin the levy and collection of a tax on the ground that the officers charged with the execution of the tax laws of Ohio unjustly discriminated against the bank and its stockholders in their assessment of value upon national bank stock as compared with that placed by them on other property. The question was raised in that case whether there was not an adequate remedy at law which prevented relief in equity. As the case and its decision has been made the subject of much discussion, we think it proper to quote in full the language of Mr. Justice Miller in considering this objection:

"It is next suggested that, since there is a plain, adequate, and complete remedy by paying the money under protest and suing at law to recover it back, there can be no equitable jurisdiction of the case. The reply to that is that the bank is not in a condition where the remedy is adequate. In paying the money it is acting in a fiduciary capacity as the agent of the stockholders, an agency created by the statute of the state. If it pays an unlawful tax assessed against its stockholders, they may resist the right of the bank to collect it from them. The bank, as a corporation, is not liable for the tax, and occupies the position of stakeholder, on whom the cost and trouble of the litigation should not fall. If it pays, it may be subjected to a separate suit by each shareholder. If it refuses, it must either withhold dividends, and subject itself to litigation by doing so, or refuse to obey the laws, and subject itself to suit by the state It holds a trust relation, which authorizes a court of equity to see that it is protected in the exercise of the duties appertaining to it. To prevent multiplicity of suits, equity may interfere. But the statute of the state expressly declares that suits may be brought to enjoin the illegal levy of taxes and assessments or the collection of them. Rev. St. Ohio 1880, § 5848; 53 Ohio Laws, 178, §§ 1, 2. And though we have repeatedly decided in this court that the statute of a state cannot control the mode of procedure in equity cases in federal courts, nor deprive them of their separate equity jurisdiction, we have also held that, where a statute of a state created a new right or provided a new remedy, the federal courts will enforce that right either on the common-law or equity side of its docket, as the nature of the new right or new remedy requires. Van Norden v. Morton, 99 U. S. 378. Here there can be no doubt that the remedy by injunction against an illegal tax, expressly granted by the statute, is to be enforced, and can only be appropriately enforced, on the equity side of the court. The statute also answers another objection made to the relief sought in this suit, namely, that equity will not enjoin the collection of a tax except under some of the well-known heads of equity jurisdiction, among which is not a mere overvaluation, or the illegality of the tax, or in any case where there is an adequate remedy at law. The statute of Ohio expressly provides for an injunction against the collection of a tax illegally assessed, as well as for an action to recover back such tax when paid, showing clearly an intention to authorize both remedies in such cases. Independently of this statute, however, we are of

opinion that when a rule or system of valuation is adopted by those whose duty it is to make the assessment, which is designed to operate unequally, and to violate a fundamental principle of the constitution, and when this rule is applied not solely to one individual, but to a large class of individuals or corporations, that equity may properly interfere to restrain the operation of this unconstitutional exercise of power. That is precisely the case made by this bill, and, if supported by the testimony, relief ought to be given."

It is perfectly clear from this language that, in the opinion of the supreme court, there were several grounds upon which the equitable jurisdiction of the court in that case could be sustained, but it is also obvious that the court regarded the statute of the state conferring the remedy by injunction as a sufficient reason for exercising the jurisdiction. It treated the remedy thus granted by statute as a new right thereby conferred, to be enforced as the nature of that right and remedy required; and, because injunction was naturally an equitable remedy, it was held that the case must be heard on the equity side of the federal court. In Railroad Co. v. Cheyenne, 113 U. S. 516, 526, 5 Sup. Ct. 605, Mr. Justice Bradley, speaking for the court, referred to Cummings v. Bank, and to the equitable remedy therein permitted against the illegal tax, and, after speaking of the other grounds upon which it had been granted, said: "In the same case the fact that a like remedy by injunction was given to parties in the state court was regarded as entitled to much weight." In Shelton v. Platt, 139 U. S. 591–599, 11 Sup. Ct. 649, Chief Justice Fuller, to show that Cummings v. Bank did not sustain the claim of counsel that the jurisdiction to enjoin a tax had been uniformly exercised in the federal courts, when the tax was wholly illegal and void, said:

"In Cummings v. Bank, the jurisdiction was maintained upon the ground of preventing multiplicity of suits, as well as that the remedy by injunction against an illegal tax was expressly granted by a statute of the state, whose levy of taxes was drawn in question."

The principle stated by Mr. Justice Miller in Cummings' Case, that federal courts of equity will enforce new equitable rights conferred by state statutes, was first announced in Clark v. Smith, 13 Pet. 195, and it has been applied or recognized in many cases since. In re Broderick's Will, 21 Wall. 503, 519, 520; Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495; Reynolds v. Bank, 112 U. S. 405, 5 Sup. Ct. 213; Chapman v. Brewer, 114 U. S. 158, 170, 171, 5 Sup. Ct. 799; U. S. v. Wilson, 118 U. S. 86, 89, 6 Sup. Ct. 991; More v. Steinbach, 127 U. S. 70, 84, 8 Sup. Ct. 1067; Greeley v. Lowe, 155 U. S. 58, 75, 15 Sup. Ct. 24. A vigorous attack, however, has been made upon the language of Mr. Justice Miller in Cummings v. Bank, in so far as it seems to sustain the state statute as alone a sufficient ground for the exercise of equitable jurisdiction by injunction in the federal court. It is said that this holding, if it is to be regarded as such, cannot be reconciled with more recent decisions of the supreme court, and that it is quite in conflict with section 723 of the Revised Statutes of the United States, which provides that suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete

remedy may be had at law. Our attention is called by counsel to the fact that section 723 of the Revised Statutes of the United States was not mentioned in Cummings v. Bank. The section eo nomine was not mentioned, but the objection that there was a plain, adequate, and complete remedy at law as a reason for denying equitable jurisdiction was expressly considered; and, as the section has several times been held to be only declaratory of the rule which would prevail were it not in force, and to have been passed only to emphasize its importance (New York Guaranty & Indemnity Co. v. Memphis Water Co., 107 U. S. 205–214, 2 Sup. Ct. 279), we do not regard the failure of Mr. Justice Miller in the Cummings Case specifically to refer to the section as furnishing any reasonable ground for the contention that the objection arising from section 723 was not fully considered by the court in that case.

The cases chiefly relied upon by counsel for appellants to sustain their contention are those of Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 713; Whitehead v. Shattuck, 138 U. S. 152, 11 Sup. Ct. 276; and Wehrman v. Conklin, 155 U. S. 323, 15 Sup. Ct. 129. In Scott v. Neely it was held that the statute of Mississippi, which permitted the filing of a creditors' bill in equity upon a claim which had not been carried to judgment, could not be enforced in the federal equity court. In that case Mr. Justice Field said:

"It is sought to uphold the affirmative of this position on the ground that the statute of Mississippi creates a new equitable right in the creditor, which, being capable of assertion by proceedings in conformity with the pleadings and practice in equity, will be enforced in those courts. * * * The general proposition as to the enforcement in the federal courts of new equitable rights created by the states is undoubtedly correct, subject, however, to this qualification: that such enforcement does not impair any right conferred, or conflict with any inhibition imposed, by the constitution or laws of the United States. Neither such right nor such inhibition can be in any way impaired, however fully the new equitable right may be enjoyed or enforced in the states by whose legislation it is created. The constitution, in its seventh amendment, declares that 'in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.' In the federal courts this right cannot be dispensed with, except by the assent of the parties entitled to it; nor can it be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action or during its pendency. Such aid in the federal courts must be sought in separate proceedings, to the end that the right to a trial by a jury in the legal action may be preserved intact."

It will thus be seen that the decision rests on a right of trial by jury, which both of the parties would have had in law had the plain, adequate, and complete remedy furnished by the law been pursued. It is true that at another place in his opinion Mr. Justice Field lays down the proposition that the party aggrieved must seek his remedy in the court of equity, "not only because the defendant has a constitutional right to a trial by jury, but because of the prohibition of the act of congress to pursue his remedy in such cases in a court of equity." But it will be observed that in all the other cases in the supreme court in which the question has arisen the reason for strictly enforcing section 723 has been found alone in the seventh amendment of the constitution preserv-

ing the right of trial by jury. In Cates v. Allen, 149 U. S. 451–457, 13 Sup. Ct. 883, 977, where reference was made to the case of Scott v. Neely by Mr. Chief Justice Fuller, and its effect was explained, it was stated that the new equitable right secured by the Code of Mississippi could not be enforced in the courts of the United States, because in conflict with the constitutional provision by which the right of trial by jury is secured. The first and leading case, which is quoted in nearly all the others which have succeeded, is that of Hipp v. Babin, 19 How. 271. That was an appeal from the circuit court of the United States sitting in equity. It was held that the bill could not be entertained, because the complainant sought to enforce a merely legal title to land. Without referring to the various authorities, Mr. Justice Campbell, speaking for the court, said:

"And the result of the argument is that, whenever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury."

In Thompson v. Railroad Cos., 6 Wall. 134, it was said, in reversing a decree in equity for want of jurisdiction, by Mr. Justice Davis, who delivered the opinion of the court:

"Thus an action at law, which sought solely to recover damages for a breach of contract, was transmuted into a suit in equity, and the defendant deprived of the constitutional privilege of trial by jury."

In Insurance Co. v. Bailey, 13 Wall. 616–621, in which a decree had been entered dismissing the bill below for want of jurisdiction on the ground that there was an adequate remedy at law, the language of Mr. Justice Campbell from Hipp v. Babin, quoted above, is cited. The same language was cited again with approval by Mr. Justice Hunt in delivering the opinion of the court in Grand Chute v. Winegar, 15 Wall. 373–375, and he continued:

"The right to a trial by jury is a great constitutional right, and it is only in exceptional cases, and for specified causes, that a party may be deprived of it. It is in vindication of this great principle, and as declaratory of the common law, that the judiciary act of 1789, in its sixteenth section, declares 'that suits in equity shall not be sustained in either of the courts of the United States in any case where adequate and complete remedy may be had at law.'"

In Root v. Railway Co., 105 U. S. 189–212, the language already quoted from Mr. Justice Campbell's opinion in Hipp v. Babin, supra, is again quoted. The same language is again quoted with approval in Killian v. Ebbinghaus, 110 U. S. 568–573, 4 Sup. Ct. 235. In Buzard v. Houston, 119 U. S. 347, 7 Sup. Ct. 251, where the question of equitable jurisdiction arose, Mr. Justice Gray, speaking for the court, began his opinion as follows:

"In the judiciary act of 1789, by which the first congress established the judicial courts of the United States, and defined their jurisdiction, it is enacted that 'suits in equity shall not be sustained in either of the courts of the United States in any case where plain, adequate, and complete remedy may be had at law.' * * * Five days later, on September 29, 1789, the same congress proposed to the legislatures of the several states the article afterwards ratified as the seventh amendment of the constitution, which declares that 'in suits at common law, where the value in controversy shall

exceed twenty dollars, the right of trial by jury shall be preserved.' * * * The effect of the provision of the judiciary act, as often stated by this court, is that 'whenever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy, without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury.' "

The last utterance of the supreme court, and that most significant in this discussion, is to be found in the opinion of Mr. Justice Brown, speaking for the court, in Greeley v. Lowe, 155 U. S. 58–75, 15 Sup. Ct. 28, where he said:

"The objections go, not to the jurisdiction of the federal court as such, but to the maintenance of such a bill in any court of equity in the state of Florida. They are questions proper to be considered on demurrer to the bill, and as bearing upon such questions the local practice of the state in that regard may become an important consideration. This court has held in a multitude of cases that where the laws of a particular state gave a remedy in equity, as, for instance, a bill by a party in or out of possession to quiet title to lands, such remedy would be enforced in the federal courts, if it did not infringe upon the constitutional rights of the parties to a trial by jury."

And, among other cases, the learned justice cites Cummings v. Bank, 101 U. S. 153, 157, as an instance of a statute-given remedy enforceable in equity.

We think this review of the cases justifies the conclusion that the main purpose of section 723 was to emphasize the necessity for preserving to litigants in courts of the United States the right to trial by jury secured by the seventh amendment in suits at common law, and that, where a state statute grants to litigants in its courts an equitable remedy which does not impinge on their right to a trial by jury at common law, courts of the United States, sitting in the state as courts of equity, may grant the same statutory relief as that afforded in the state tribunals. In such cases, where the right of jury trial is not interfered with, the equitable remedy afforded by the statute of the state is usually so much more complete than the old remedies that the language of section 723 interposes no obstacle to equitable jurisdiction in the federal courts. Thus, in this case, no one can doubt that the remedy by enjoining an illegal tax raises in the most summary and satisfactory way the question of the illegality of the tax, and relieves the taxpayer of the burden of paying the tax, or awaiting the slow course of a civil suit by the state to recover it from him. As said by the supreme court of the United States in Osborn v. Bank, 9 Wheat. 738, 842, through Chief Justice Marshall:

"The single act of levying the tax, in the first instance, is the cause of an action at law; but that affords a remedy only for the single act, and is not equal to the remedy in chancery which prevents its repetition and protects the privilege."

Unless, therefore, the effect of this remedy by injunction is to deprive one entitled to it of his right under the seventh amendment to his trial by jury, it seems clear that the new remedy is more complete and adequate than that at law, and, therefore, not within the inhibition of section 723.

The question, therefore, is whether, by allowing the remedy by injunction to taxpayers assessed illegally, the public officers, and the

state for whom they act, can be said to be deprived of the right of trial by jury, secured to them by the seventh amendment of the constitution. It is well settled that the seventh amendment does not secure to the person subjected to taxation the right of jury trial in any controversy which he may raise as to the legality of the tax. It is wholly within the power of the sovereign levying the tax to provide any reasonable mode of the most summary character to test the legality of the assessments and levies made by its taxing officers. The collection of a tax is an administrative matter, and, provided some reasonable mode is given to the taxpayer by which he may be heard upon the question of the legality of the tax, it is due process of law, and he cannot complain. The whole question is fully considered in the case of Den v. Improvement Co., 18 How. 272, in Cheatham v. U. S., 92 U. S. 85, in Auffmordt v. Hedden, 137 U. S. 310, 11 Sup. Ct. 103, and in Arnson v. Murphy, 109 U. S. 238, 3 Sup. Ct. 184; and the principles above stated are elaborated and fully sustained. In the case of Auffmordt v. Hedden it was claimed that section 2930 of the Revised Statutes of the United States was unconstitutional in making the decision of the appraisers of imported goods final, because the plaintiffs had a right to have the question of the dutiable value of the goods passed upon by a jury. The objection was not sustained. In Cheatham v. U. S., Mr. Justice Miller used this language:

"All governments, in all times, have found it necessary to adopt stringent measures for the collection of taxes, and to be rigid in the enforcement of them. These measures are not judicial, nor does the government resort, except in extraordinary cases, to the courts for that purpose. The revenue measures of every civilized government constitute a system which provides for its enforcement by officers commissioned for that purpose. In this country, this system for each state, or for the federal government, provides safeguards of its own against mistake, injustice, or oppression in the administration of its revenue laws."

If, then, a state government may deny to the taxpayer a right to test questions of fact relevant to the legality of the tax by a jury trial, the state's representatives have no right to insist upon a jury trial as a right secured to them by the seventh amendment in controversies over the legality of the tax, unless the state exacts the right for itself and its representatives. In other words, this right of a jury trial is one which may be waived, and, where a state makes provision in suits against itself for a remedy, either by injunction or by payment of the money to its officers and a suit for recovery, it must be taken to waive any right which it or its representatives might have to a jury trial, by offering to its taxpayers a remedy by injunction on the sole ground of illegality. It might be that the state taxing officer sued in assumpsit or for trespass by reason of the receipt of illegal taxes, or the unlawful distraint of property, would have, because of his possible individual liability, a right of jury trial in the courts of the United States under the seventh amendment; but a suit to enjoin his receipt of the money or his distraint of the goods does not interfere with such a right, because it must intervene, if at all, before he can assume any personal liability in regard to the matter. The justiciable issue at the time of the injunction is between the taxpayer on the one hand and the state on the

other, represented by its officers; and, unless the state has the right of jury trial, and insists upon it, they cannot complain. It is only after they have taken some steps under color of the law which prejudice the taxpayer in his property rights, that the element of their personal liability can cut the slightest figure. The state has complete discretion as to the form of the remedy for redress of illegal taxation which it will accord to its taxpayers, so long as a hearing of some kind is given. In the exercise of this discretion, the state of Ohio has enacted into law chapter 13 of title 1 of division 7 of the Revised Statutes of Ohio as a special mode by which taxpayers may test the legality of a tax, and the easiest and best of the remedies given is that by injunction. Must a court of equity of the United States, sitting in Ohio, say to one asking the benefit of this remedy conceded by the state: "True, the state may deprive you of a trial by jury if it sees fit in tax litigation with itself, but when the state in such suits of its own gives you the option of a jury trial or an injunction, we must force a jury trial on you?" We think not. Our conclusion, therefore, is that there is no conflict between Cummings v. Bank and the cases of which Scott v. Neely is a type. The case of Cummings v. Bank is still quoted by the supreme court of the United States as an authority to sustain the view that a new equitable right secured by statute of the state may be enforced on the equity side of the federal court, provided it does not interfere with the right of trial by jury. The case has never been questioned or dissented from, and, even if we were not able to explain a possible conflict between that and some other cases since decided by the supreme court, we should still feel ourselves bound in a case like the present, in which the case of Cummings v. Bank has exact application, to follow it, and to leave to the supreme court the duty of overruling the one or the other of the two conflicting lines of decision. The circuit court rightly held, therefore, that it had equitable jurisdiction in this case, founded on the statutes of Ohio.

This brings us to the question whether the District of Columbia bonds in controversy were illegally assessed for taxation. The bonds were in form following:

District of Columbia.

Exempt from Funding Bond Taxation.

Interest, 3.65-100 per cent.

This certifies that the District of Columbia is indebted unto Thomas W. Cornell, or assigns, in the sum of five thousand dollars, payable August 1. 1924, with interest from the first day of August, 1883, inclusive, at the rate of three and sixty-five hundredths per cent. per annum, payable on the first days of February and August of each year, at the treasury of the United States. This bond is authorized by act of congress approved June 20, 1874, amended by an act approved February 20, 1875, by which the faith of the United States is hereby pledged, that the United States will, by proper proportional appropriations, as contemplated in this act, and by causing to be levied upon the property within said District such taxes as will do so, provide the revenues necessary to pay the interest on said bonds as the same may become due and payable, and create a sinking fund for the payment of the principal thereof at maturity.

Washington, January 12, 1884.

J. S. Trichnor,                                        A. U. Wyman,
    Auditor of the D. C.                              Treasurer U. S.

The bonds were authorized by act of congress approved June 20, 1874 (18 Stat. 120). Section 6 of this act constituted a board of audit to examine and audit for settlement all the unfunded and floating debt of the District of Columbia and of the board of public works thereof, specifying and describing the various kinds of indebtedness in seven classes, to wit: Sewer certificates; certificates of the auditor of the board of public works; the debt evidenced by the certificates of the auditor and the comptroller of the District of Columbia; debts arising out of contracts, written or oral, made by the board of public works; debts arising from contracts, written or oral, made on behalf of the District of Columbia; claims for private property taken by the board of public works from the avenues, streets, and alleys of the cities of Washington and Georgetown; and all unadjusted claims for damages that may have been presented to the board of public works for injuries sustained by reason of public improvements or repairs. Section 7 was as follows:

"That the sinking fund commissioners of said District are hereby continued; and it shall be the duty of said sinking fund commissioners to cause bonds of the District of Columbia to be prepared in sums of fifty and five hundred dollars, bearing date August first, eighteen hundred and seventy-four, payable fifty years after date, bearing interest at the rate of three and sixty-five hundredths per centum per annum, payable semi-annually, to be signed by the secretary and the treasurer of said sinking fund commissioners and countersigned by the comptroller of said District, and sealed as the board may direct; which bonds shall be exempt from taxation by federal, state or municipal authority, engraved and printed at the expense of the District of Columbia and in form not inconsistent herewith. And the faith of the United States is hereby pledged that the United States will, by proper proportional appropriations as contemplated in this act, and by causing to be levied upon the property within said District such taxes as will provide the revenues necessary to pay the interest on said bonds as the same may become due and payable and create a sinking fund for the payment of the principal thereof at maturity. Said bonds shall be numbered consecutively, and registered in the office of the comptroller of said District, and shall also be registered in the office of the register of the treasury of the United States, for which last named registration the secretary of the treasury shall make such provision as may be necessary. And said commissioners shall use all necessary means for the prevention of any unauthorized or fraudulent issue of any of such bonds. And the said sinking fund commissioners are hereby authorized to exchange said bonds at par for like sums of any class of indebtedness in the preceding section of this act named, including sewer taxes or assessments paid, evidenced by certificates of the auditing board provided for in this act."

By act of February 20, 1875 (18 Stat. 332), the seventh section above quoted was amended in one part so that it read:

"And the faith of the United States is hereby pledged that the United States will, by proper proportional appropriations as contemplated in this act, and by causing to be levied upon the property within said district such taxes as will do so, provide the revenues necessary to pay the interest on said bonds as the same may become due and payable, and create a sinking fund for the payment of the principal thereof at maturity."

The first contention with respect to these statutes is that the words, "which bonds shall be exempt from taxation by federal, state or municipal authority," apply only to taxation within the District of Columbia either by the government of the United States,

the government of the District of Columbia as a state, or the government of the corporation considered as a municipality. We think the construction untenable. The expression "federal, state or municipal authority" undoubtedly refers to the distinction between the government of the United States, the sovereign states which compose it, and the municipal authorities, either of those states or of the United States. It may be that in some statutes and under some circumstances the District of Columbia may be described as a state (Hepburn v. Ellzey, 2 Cranch, 445–452), but, in the connection in which it is used here, such a construction would be exceedingly strained. We have no doubt that it was the intention of congress to exempt these bonds from taxation everywhere within the limits of the United States, whether by federal, state, or municipal authority. Such exemptions are usually for the purpose of securing a sale of the bonds at a low interest. The interest here provided was 3.65 per cent., and an exemption limited to the District of Columbia could accomplish little in furthering the sale of the bonds. The possible market for such bonds embraced the country, and the exemption, to be of any substantial service, must have been equally extensive.

We come, therefore, to the last contention of counsel, namely, that, if congress did intend to exempt these bonds from taxation by the states, it had no power to do so. If anything has been settled by the decisions of the supreme court of the United States in interpreting the federal constitution, it is that a state cannot tax evidences of indebtedness of the United States issued as a proper means of exercising powers conferred by the constitution. In the great judgments of the supreme court delivered by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, and in Osborn v. Bank, 9 Wheat. 738, he established by the most cogent reasoning that a state had "no powers, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional law enacted by congress to carry into execution the powers vested in the general government," and enunciated a principle the purpose of which was declared to be to place beyond the reach of the state "all those powers which are conferred by the people of the United States on the government of the Union, and all those means which are given for the purpose of carrying those powers into execution." In these two cases the state taxation which was declared void was imposed in the one case upon the means by which the Bank of the United States, incorporated for lawful governmental purposes, carried on its authorized banking business, and in the other case upon the franchise to do business granted by congress. In Weston v. Charleston, 2 Pet. 449, the city council of Charleston, S. C., passed an ordinance imposing a specific tax on securities of the United States evidencing its indebtedness, and then called "stock" of the United States, and the judgment of the supreme court was invoked upon the validity of the ordinance. As a necessary corollary to the proposition laid down in McCulloch v. Maryland, the act of the municipality of the state of South Carolina was held to be invalid. We quote two passages

from the opinion of Chief Justice Marshall in Weston v. Charleston:

"Is the stock issued for loans made to the government of the United States liable to be taxed by states and corporations? Congress has power 'to borrow money on the credit of the United States.' The stock it issues is the evidence of a debt by the exercise of this power. The tax in question is a tax upon the contract subsisting between the government and the individual. It bears directly upon that contract, while subsisting and in full force. The power operates upon the contract the instant it is framed, and must simply imply a right to affect that contract. If the states and corporations throughout the Union possess the power to tax a contract for the loan of money, what shall arrest this principle in its application to every other contract? What measure can the government adopt which will not be exposed to its influence?" 2 Pet. 464. "The American people have conferred the power of borrowing money on their government, and, by making that government supreme, have shielded its action, in the exercise of this power, from the action of the local governments. The grant of the power is incompatible with a restraining or controlling power, and the declaration of supremacy is a declaration that no such restraining or controlling power shall be exercised. The right to tax the contract to any extent, when made, must operate upon the power to borrow, before it is exercised, and have a sensible influence on the contract. The extent of this influence depends on the will of a distinct government. To any extent, however inconsiderable, it is a burden on the operations of government. It may be carried to an extent which shall arrest them entirely." 2 Pet. 487.

The question next arose in a somewhat different form in People v. Commissioners, 2 Black, 620. There, under a tax law, taxing all the property of a bank, the assessors had included in the total, "stock" of the United States held by the bank, and the validity of the tax was asserted on the ground that the stock was not specifically taxed, as it was in Weston v. Charleston, and thus discriminated against, but was treated like any other property or choses in action held by the bank. The supreme court refused to recognize this as a valid distinction, holding that any tax, no matter how imposed, or with what motive, upon contracts of loan issued by the United States, impeded the exercise by the national government of a constitutional power, and was void.

In Bank Tax Case, 2 Wall. 200, a tax was imposed by the state of New York on the capital of a bank as paid in, and the question was whether, in assessing the capital for taxation, the state authorities must reduce the amount to be taxed by that part of the paid-in capital which had been invested in United States securities after it was paid in. It was held that the reduction must be made, because otherwise the state law operated to tax a contract of loan issued by the United States.

In Banks v. Mayor, 7 Wall. 16, the state of New York had taxed certificates of indebtedness issued by officers of the United States for supplies needed in the prosecution of the war, and it was attempted to take such choses in action out of the previous cases by the argument that they were not issued by the United States to borrow money, but only in payment for supplies. This contention was answered by the court, through Chief Justice Chase, thus:

"An attempt was made at the bar to establish a distinction between bonds of the government expressed for loans of money and the certificate of indebtedness for which the exemption was claimed. The argument was ingen-

ious, but failed to convince us that such a distinction can be maintained. It may be admitted that those certificates were issued in payment of supplies and in satisfaction of demands of public creditors. But we fail to perceive either that there is a solid distinction between certificates of indebtedness issued for money borrowed and given to creditors, and certificates of indebtedness issued directly to creditors in payment of their demands; or that such certificates, issued as a means of executing constitutional powers of the government other than of borrowing money, are not as much beyond control and limitation by the states through taxation as bonds or other obligations issued for loans of money." 7 Wall. 25.

In the same case Chief Justice Chase used this language:

"The authority to borrow money on the credit of the United States is, in the enumeration of the powers expressly granted by the constitution, second in place, and only second in importance, to the authority to lay and collect taxes. Both are given as means to the exercise of the functions of government under the constitution; and both, if neither had been expressly conferred, would be necessarily implied from other powers." Page 23.

The last case in which the question was mooted was in Bank v. Supervisors, 7 Wall. 29, in which the right of a state to tax the United States treasury notes, made legal tender by law, was asserted. The fact that these instruments were intended to circulate as money was claimed to take them out of the rule established in prior cases. The court conceded that the distinction between the treasury notes and government bonds, pointed out and relied on in argument, justified the contention that the interference with the exercise of constitutional power involved in their issue would not be so great in case of legal tender notes as in that of bonds; but, as they were obligations of the United States, issued "as a means to ends entirely within the constitutional power of the government," it was held "clearly within the discretion of congress to determine whether, in view of all the circumstances attending the issue of the notes, their usefulness, as a means of carrying on the government, would be enhanced by exemption from taxation; and within the constitutional power of congress, having resolved the question of usefulness affirmatively, to provide by law for such exemption."

From this review of the cases, it is evident that, where congress lawfully directs the issue of evidences of indebtedness in the exercise of any power derived by it from the constitution, whether it be by virtue of the grant of power to borrow money on the credit of the United States, or of any other grant, such evidences of debt are exempt from state taxation, or at least may be exempted therefrom if congress sees fit to give them this quality. Why, then, are the bonds here in controversy not within the exempting power of congress? The answer made by counsel for the appellant is that they are bonds, not of the United States, but of the municipality known as the District of Columbia, a local agency of the national government, and that the bonds were issued by that municipal agent for a local purpose. The argument is, if we rightly comprehend it, that when the congress of the United States establishes a municipal corporation in the District of Columbia, and gives it power to issue bonds for local purposes, it is exercising the power of exclusive legislation over the District of Columbia conferred by the seventeenth

clause of the eighth section of the first article of the constitution, and is legislating, and can legislate, only as a state would legislate in conferring similar powers upon one of its municipalities, and that this power and the incidental means used in its exercise are to be as much confined in their operation to the territory of the District as is a state's power to the territory within its borders; that bonds issued by the District of Columbia are mere local means for the exercise of this local power; and that congress can no more attach the quality of nontaxability to such securities beyond the boundaries of the District of Columbia than a state can give to securities of its municipalities, when held in other states, the quality of exemption from taxes therein imposed. The argument is enforced by referring to the case of Bonaparte v. Tax Court, 104 U. S. 592, wherein it was held that the federal constitution did not prohibit a state from taxing the bonds of another state, held within the taxing state, although made exempt from taxation by the state issuing them. The reasons for the holding were that the federal constitution did not restrict one state from taxing the bonds of another, and that the tax exemption laws of one state could not be given extraterritorial effect. By an alleged parity of reasoning, it is urged upon us that, as congress cannot give extraterritorial effect to the legislation passed by it in the government of the District of Columbia, it cannot exempt the bonds of the District. The argument is ingenious, but the distinction taken can no more be supported than those which the supreme court has brushed away in the decisions on the subject already cited. The seventeenth clause of the eighth section of article 1 of the constitution is as follows:

"To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards and other needful buildings."

In pursuance to the constitution of the United States, Maryland ceded to the United States the county of Washington, and congress accepted the cession in 1789. A similar cession from Virginia was accepted about the same time, and the 10 miles square thus granted and received became, as the constitution provided it should become, the seat of government. The fundamental error, as we conceive it, in the argument of the appellant, is the assumption that the organization of a municipality and the endowing it with the usual powers of a city under the clause of the constitution above quoted were for the peculiar benefit of the persons living within the district, and thus for a purely local purpose. Such a view misses the whole object of the constitutional grant. The framers of the constitution had no particular concern in regard to the municipal control or organization of the people who lived or were likely to live in any 10 miles square in the United States, except as they should form a city in which it would accord with the dignity and power of a great nation to establish its seat of govern-

ment. It was meet that so powerful a sovereignty should have a local habitation the character of which it might absolutely control, and the government of which it should not share with the states in whose territory it exercised but a limited sovereignty, supreme, it is true, in cases where it could be exercised at all, but much restricted in the field of its operation. The object of the grant of exclusive legislation over the district was, therefore, national in the highest sense, and the city organized under the grant became the city, not of a state, not of a district, but of a nation. In the same article which granted the powers of exclusive legislation over its seat of government are conferred all the other great powers which make the nation, including the power to borrow money on the credit of the United States. He would be a strict constructionist, indeed, who should deny to congress the exercise of this latter power in furtherance of that of organizing and maintaining a proper local government at the seat of government. Each is for a national purpose, and the one may be used in aid of the other. As Chief Justice Chase says in the passage already quoted, the power to borrow money was given "as a means to the exercise of the functions of government under the constitution." The bonds in question were issued to borrow money to pay the debts incurred in the national purpose of improving and beautifying the city of Washington, the capital of the nation. The congress directed the issue of the bonds in the name of the District, but on their face it pledged the faith of the United States to pay one-half of the bonds, when due, out of its treasury, and to raise the other half by taxation in a territory over which it had exclusive legislation. Was not this borrowing the money on the credit of the United States? Does an obligation rest any less on the credit of a government because it specifies on its face the source from which the government proposes to secure the funds with which to pay it? Surely not. These bonds were, therefore, issued by virtue of the same power which was held to be impeded by state taxation in Weston v. Charleston and in all the cases which have followed its authority. They were issued for a purpose as national as the making of war, the maintenance of the public credit, or the construction of a navy; and in effecting that purpose by means of the express constitutional power to borrow money on the credit of the United States, the legislative power of congress was as territorially extensive as the exercise of the power for any other constitutional purpose. Hence it operated in each state upon the taxing officers of each state and upon the government thereof, and expressly forbade the taxation of these bonds.

In the case of Cohens v. Virginia, 6 Wheat. 264, the corporation of the city of Washington passed an ordinance authorizing the drawing of a lottery to raise money to build a city building. It was expressly given power by act of congress to authorize such a lottery. Tickets were sold in Virginia, and the seller was prosecuted under a Virginia law, and pleaded as a defense the act of congress and the ordinance of the city of Washington in pursuance thereof. It was contended that congress could not, by local

legislation concerning the District of Columbia, thus give extraterritorial immunity from punishment under the police laws of a state. The supreme court was not obliged to consider this question, because it held that congress had not by this legislation intended to give such immunity. In the course of the argument by the attorney-general, Mr. Wirt, in maintaining the immunity, put this question to the court:

"The act of May 6, 1796, authorized the commissioners for erecting the public buildings to borrow money for that purpose. Would it have been competent for the legislatures of the states to have impeded this loan by punishing their citizens for subscribing to this stock?" 6 Wheat. 437.

To this Chief Justice Marshall answered:

"We readily admit that the act establishing the seat of government and the act appointing commissioners to superintend the public buildings are laws of universal obligation. We admit, too, that the laws of any state to defeat the loan authorized by congress would have been void, as would have been any attempt to arrest the progress of the canal, or of any other measure which congress may adopt. These, and all other laws relative to the District, have the authority which may be claimed by other acts of the national legislature; but their extent is to be determined by those rules of construction which are applicable to all laws. The act incorporating the city of Washington is, unquestionably, of universal obligation; but the extent of the corporate powers conferred by that act is to be determined by those considerations which belong to the case."

It may well be inferred from this what the same great judge would have answered to a similar inquiry in respect of the bonds here in controversy. The division of the powers in the constitution between the states and the general government is such that neither the states nor the United States are entitled to impede or obstruct the exercise of the powers accorded by the constitution to the other. It was, therefore, held in the Income Tax Case (Pollock v. Trust Co., 157 U. S. 429, 459, 15 Sup. Ct. 673) that the United States could not tax the bonds of a municipality of a state, because it would thereby be interfering with and obstructing an instrumentality of a state government. See, also, Mercantile Bank v. New York, 121 U. S. 138, 162, 7 Sup. Ct. 826; U. S. v. Railroad Co., 17 Wall. 322. It is difficult to understand why the same principle does not require that the bonds of the local municipal agents of the United States should be exempt from taxation by the state government. We cannot follow appellants' counsel in their attempt to distinguish these cases from the one at bar. We are clearly of the opinion that the bonds here assessed were exempt from taxation, and the decree of the circuit court enjoining the collection of the tax upon them is affirmed, with costs.