## In re WAUGH.

### In re CASKEY et al.

(Circuit Court of Appeals, Ninth Circuit. October 3, 1904.)

No. 1,051.

1. BANKRUPTCY—INVOLUNTARY PROCEEDINGS—MOTION FOR ADJUDICATION ON PLEADINGS.

Where, after the filing of answers to a petition in involuntary bankruptcy presenting issues of fact, the petitioners move for an adjudication on the pleadings, they thereby admit the facts properly pleaded in the answers, in accordance with the general rules of equity practice, and the only question presented is as to the legal sufficiency of the answers. If the motion is denied, defendants are entitled to a final decree dismissing the petition.

Petition for Revision of Proceedings of the District Court of the United States for the Northern Division of the District of Washington, in Bankruptcy.

Chas. S. Wiley and Napthaly, Friedenrich & Ackerman, for petitioner.

George A. Hawley, William A. Peters, and John H. Powell, for respondents.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This is an original petition to this court, filed pursuant to the provisions of section 24, cl. "b," of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 553 [U. S. Comp. St. 1901, p. 3432], to revise, in matters of law, certain involuntary bankruptcy proceedings in the court below. Those proceedings were initiated by the filing in that court by three corporations—Crane Company, Dexter, Horton & Co., and Washington National Bank of Seattle—of a petition entitled, "In the Matter of J. C. Caskey, J. C. Waugh, E. A. Freeman, and H. D. Freeman, Copartners Doing Business under the Name and Style of the North Avon Lumber Company, Bankrupts," in which it is alleged, in substance, that Caskey, Waugh, and the two Freemans, for the greater portion of six months next preceding the filing of the petition, had their principal place of business at North Avon, in the county of Skagitt, state of Washington, and that all of them, except Caskey, during the same time resided at Mt. Vernon, in Skagitt county; that Caskey dur-

ing the greater portion of the six-months period resided in the city of Seattle, and that each of them owed debts exceeding the amount of $1,000; that the petitioners are creditors of the parties named, having provable claims amounting in the aggregate to more than $500, over and above securities held by them, the nature and amount of which are as follows: That Crane Company's claim is for $394.36, for merchandise sold and delivered to the alleged bankrupts, and the claims of the Washington National Bank and of Dexter, Horton & Co. are each for money in excess of $2,000 loaned to the alleged bankrupts, evidenced by their promissory notes, executed under the name and style of the North Avon Lumber Company. It is alleged that they are insolvent, and that within four months next preceding the date of the filing of the petition they committed acts of bankruptcy, in that they did execute and deliver a certain deed of trust to Ira Bronson and C. F. Wiley, thereby transferring to them all the property of the North Avon Lumber Company, and that the alleged bankrupts did thereafter, and within four months next preceding the filing of the petition, being insolvent, suffer a receiver to be appointed under and by virtue of an order of the superior court of the state of Washington for Skagitt county, to take charge of the property of the said bankrupts, as the North Avon Lumber Company. Subpoena was issued on that petition and served on all the respondents; Caskey being served at Portland, Or., on which ground he appeared specially, and moved for a dismissal of the proceedings as to him for lack of jurisdiction, and on the ground that on June 3, 1904, he sold and conveyed all of his interest in the North Avon Lumber Company, since which time he has had no interest therein, and also on the ground "that for more than four months prior to the filing of the petition herein said respondent was not a resident of, or domiciled in, or doing business in, the above-named judicial district, or state of Washington, but was domiciled, residing, and doing business at Portland, in the state of Oregon, and that said respondent is now a bona fide resident of Portland, Or., and that said respondent was not served within the jurisdiction of this court with process." Waugh and the two Freemans filed answers controverting the facts alleged in the petition; that of the Freemans also averring that they are wage earners, within the definition of that term contained in the bankruptcy act.

The answer of Waugh not only put in issue the averments of the petition, but set up, among other things, the following affirmative defense: That he (Waugh), about August, 1902, owned certain machinery, wagons, horses, and other property which had been used by him in cutting lumber near Mt. Vernon, in Skagitt county, Wash., and had been selling the lumber to Caskey, then a resident of Seattle; that thereupon Caskey agreed with him (Waugh) that if the personal property mentioned was removed to a new mill site near North Avon, in the county of Skagitt, and the respondent Waugh were to acquire certain lands and timber near there, a corporation should be formed with a capital stock of $16,500 (the estimated value of the property), and that Caskey would pay to Waugh $5,500, whereupon one-third of the capital stock of such corporation should become the property of Caskey; that in accordance with that agreement the personal property mentioned was moved to the new mill site, which was leased to Waugh, and who also

acquired the timber and timber land contemplated, a part of which timber land was, however, conveyed to Caskey and Waugh, and was paid for with the proceeds of a note for $3,000 executed on the 26th day of August, 1902, by Waugh and Caskey to the London & San Francisco Bank, Limited, of Seattle, which note has never been paid, and, because of Caskey's inability to pay his part of that note, he reconveyed to Waugh his interest in the lands on or about the 3d day of January, 1903; that the remaining $2,500 of the $5,500 which Caskey had agreed to pay Waugh for one-third of the capital stock in the proposed corporation was finally paid to him before January 1, 1903; that, when the mill was erected at the new site near North Avon, Caskey represented to Waugh that much new machinery would be required to make the mill a model one, with a capacity of about 35,000 feet of lumber per day, but that it would not be necessary for Waugh to put any money into such new machinery, as he (Caskey) had an abundance of money, and would purchase and install all the machinery required, and that, when the proposed corporation was effected and the new mill in operation Caskey would sell the lumber cut by such new mill, and from time to time reimburse himself for any such advances from the proceeds of the lumber, and that all machinery and supplies used in the erection of the new mill, excepting such as was furnished originally by Waugh as part of the outfit valued at $16,000, was purchased and provided for the proposed corporation by Caskey under that agreement; that, as soon as the new mill was in such a condition as that it could be operated, they cut timbers for the superstructure thereof, and before it was finished rough lumber was begun to be sold by Caskey as agent of the proposed corporation, and that he continued so to sell the output of the mill from the time it was completed, in April, 1903, to about the end of May, 1903, "sending money to Mt. Vernon which this respondent [Waugh] understood to be proceeds from the sale of said lumber"; that about June 1, 1903, Waugh accidentally discovered that Caskey had borrowed money of certain banks in Seattle, and had executed notes signed with a rubber stamp containing the words, "North Avon Lumber Company, by ———, Manager," writing the name "J. C. Caskey" in the blank, and that all of these notes were negotiated upon the indorsement of Caskey, and that the respondent Waugh finally discovered that some of these notes were held by the Washington National Bank, and some by Dexter, Horton & Co., "which are probably the notes mentioned in the petition herein; but respondent avers that said Caskey had no authority to borrow money in the name of North Avon Lumber Company or this respondent, or in any other way to bind this respondent by the execution of any promissory notes, nor had he authority to incur any indebtedness on the credit of this respondent, or to create any indebtedness for this respondent." The respondent Waugh further alleged in his answer that it became necessary at times to borrow money in the operation of the mill at North Avon, and that in such instances notes therefor were always signed by him and by Caskey as individuals. The answer of Waugh further set up that, if any merchandise was purchased of the Crane Company, it was purchased by Caskey under his aforesaid agreement to provide all necessary machinery and supplies for the new mill; that all arrangements and agree-

ments between Caskey and himself above mentioned were oral and not in writing, and that no partnership agreement or understanding was ever made, and that there was never any understanding or agreement that Caskey should have anything else than one-third of the capital stock of the proposed corporation, and the right to reimburse himself for all expenditures made in completing the new mill, which reimbursement should be made out of the proceeds of the sale of lumber cut in the new mill on its completion, and after the formation of the corporation; that Caskey never had the control or management of any part of the business at North Avon, and had nothing to do with it, except to sell such lumber as was cut by the mill there prior to January 1, 1903; that no goods, wares, or merchandise were ever bought by the respondents Waugh and Caskey, or either of them, under the agreements mentioned, for the purpose of being sold again, nor did Caskey and the respondent Waugh engage in trade, or the buying and selling of merchandise, or other mercantile pursuits, or transact any other character or kind of business than that above stated. The answer of the respondent Waugh also contains a denial that he is insolvent, and an averment that he should not be declared a bankrupt for any cause in the petition mentioned, and contains a prayer that the question of his insolvency and the commission by him of the alleged acts of bankruptcy be inquired of by a jury.

Upon the coming in of the answers and the motion of Caskey, the petitioners filed a motion for an adjudication of bankruptcy, which motion, it appears from the record, came on regularly for hearing upon the petition, the answers, and the motion of Caskey, after which the court "adjudged and decreed that said motion that said respondents be adjudged bankrupts be, and the same is hereby, overruled," whereupon the respondent Waugh moved the court for a judgment of dismissal of the petition, which motion was denied, to which ruling the respondent Waugh reserved an exception. The court thereupon, upon motion of the petitioning creditors, referred the cause to a referee in bankruptcy, "with power and authority and the direction of this court to try the issues presented by the pleadings filed herein with a jury, if a jury be demanded by either party, and to make such findings and orders therein as the findings of the jury and the law of the case shall warrant, and to take such other and further action herein as may seem meet and proper." To which action of the court the respondent Waugh also excepted.

Two questions are presented and argued on the present proceeding: First, was it the duty of the court below to enter a decree dismissing the proceedings upon its decision, based upon the pleadings, that the petitioners were not entitled to a decree that the parties proceeded against were bankrupts? And, second, did it err in making the order of reference above set out? An affirmative answer to the first question will, as a matter of course, dispose of the second, also.

Rule 37 of the rules established as general orders in bankruptcy of the Supreme Court November 20, 1898 (18 Sup. Ct. x), provides that:

"In proceedings in equity instituted for the purpose of carrying into effect the provisions of the act, or for enforcing the rights and remedies given by it, the rules of equity practice established by the Supreme Court of the United States shall be followed as near as may be."

It is well settled that, except in certain specified particulars, proceedings in bankruptcy are of an equitable nature. Bardes v. Hawarden Bank, 178 U. S. 524, 534, 535, 20 Sup. Ct. 1000, 44 L. Ed. 1175; In re Herzikopf, 121 Fed. 544, 57 C. C. A. 606. The petitioning creditors took that view of the nature of the proceedings in the court below, for, waiving their right to test the truth of the matters of fact presented by the answers by replication and proof, they moved the court below, upon the pleadings, for an adjudication of bankruptcy against the respondents; thereby admitting all the averments of fact properly pleaded in the answers. In re Taylor, 102 Fed. 728, 42 C. C. A. 1; Grether v. Wright, 75 Fed. 742, 23 C. C. A. 498; Lake Erie & W. R. Co. v. Indianapolis National Bank et al. (C. C.) 65 Fed. 690; Banks v. Manchester, 128 U. S. 244, 9 Sup. Ct. 36, 32 L. Ed. 425.

The sole question, therefore, that was presented to the court below, was one of law—that is to say, whether the answers presented a good defense to the petition—and when the court refused, as it did, to adjudicate the respondents bankrupt, it in effect held the answers sufficient in law to defeat the application of the petitioners. There was no question of fact to try, by jury or otherwise, and the respondents were entitled to a final decree dismissing the petition. In re Sanford Fork & Tool Co., 160 U. S. 247, 16 Sup. Ct. 291, 40 L. Ed. 414, and cases cited therein.

The District Court is therefore directed to vacate the order of reference and all proceedings subsequent thereto, and to enter a decree dismissing the petition, at the petitioner's cost.